# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-1250

_____

R.J. Zayed, In His Capacity As Court-Appointed Receiver For The Oxford Global Partners, LLC, Universal Brokerage FX, and Other Receiver Entities

*Plaintiff - Appellant*

v.

Associated Bank, N.A.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 17, 2018
Filed: January 10, 2019

_____

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Over a period of several years, a group of scammers based in Minnesota swindled investors out of more than one hundred million dollars in a prolific Ponzi

scheme utilizing numerous business entities.  A receiver[1] was appointed to take charge of what assets remained in the business entities that were used to perpetrate the scheme and to recover any assets he could for the victims of the fraud.  The Receiver sued Associated Bank, N.A., which provided banking services to some of the scammers' entities, accusing the bank of aiding and abetting the Ponzi scheme.  At issue in this appeal is whether the district court[2] correctly concluded there was not sufficient evidence to reasonably infer the bank knew about and assisted the scammers' tortious conduct.  Because a conclusion that the bank aided and abetted the Ponzi scheme could only be reached through considerable conjecture and speculation, we affirm the district court.

## I.  Background

From 2006 to 2009, five individuals — Trevor Cook, Christopher Pettengill, Jason Beckman, Gerald Durand, and Patrick Kiley ("the scammers") — perpetrated a Ponzi scheme that took in over $193 million from investors and returned only $49 million (all from new investors' money).  *See United States v. Beckman*, 787 F.3d 466, 474 (8th Cir. 2015) (discussing the scheme in an appeal from some of the scammers' criminal convictions).  The scammers used a number of business entities that went by several variations of names that included "UBS," "Universal Brokerage," "Oxford," "Crown Forex," and "Basel Group."  *See id.* at 475, 488; *Zayed v. Associated Bank, N.A.* ("*Zayed I*"), 779 F.3d 727, 730 (8th Cir. 2015).  They told potential investors that their investments would be held in segregated accounts,

---

[1] After this case was filed, the receiver, R.J. Zayed, was granted leave to recuse himself from the case and withdrew; three other attorneys were appointed to act in his capacity as receiver in this litigation.  As in our prior opinion in this case, "the Receiver" is used to refer to the office of receiver and not any particular person. *Zayed v. Associated Bank, N.A.* ("*Zayed I*"), 779 F.3d 727, 729 n.1 (8th Cir. 2015).

[2] The Honorable David S. Doty, United States District Judge for the District of Minnesota.

completely liquid, and invested in a currency exchange program through a Swiss company, Crown Forex, S.A. *Zayed I*, 779 F.3d at 730. Eventually, the scammers were caught and ultimately sentenced to lengthy prison terms for various crimes including wire and mail fraud and money laundering. *See Beckman*, 787 F.3d at 477.

When the fraud was uncovered in 2009, the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission filed civil actions against the scammers and their entities. In those civil actions, the district court appointed a receiver, granting him the power to take control over the scammers' entities and assets and to bring legal actions in order to discharge his duties.

In 2013, the Receiver filed suit against Associated Bank for allegedly aiding and abetting the torts of fraud, breach of fiduciary duty, conversion, and negligent misrepresentation. The allegations underlying these claims centered on one former Associated Bank employee, Lien Sarles. Sarles helped open accounts for the scammers and then serviced those accounts at the bank. The Receiver alleged Sarles knew about and assisted in the scheme.

Later that year, the district court granted Associated Bank's motion to dismiss, concluding that the Receiver had not sufficiently pled a plausible claim that the bank aided and abetted the scammers' tortious conduct. On appeal, this Court reversed the district court's dismissal, concluding the Receiver's pleadings were sufficient to survive a motion to dismiss. *See Zayed I*, 779 F.3d 737.

After remand and discovery, Associated Bank moved for summary judgment. The district court granted the motion, concluding there was insufficient evidence that Associated Bank knew of and provided substantial assistance to the scammers' tortious conduct. The Receiver filed a timely appeal.

## II. Discussion

The Receiver argues on appeal that the district court erred in granting summary judgment to Associated Bank. Summary judgment is appropriate where a party shows "there is no genuine dispute as to any material fact" and the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factfinder's decision is reasonable if it is based on "sufficient probative evidence" and not on "mere speculation, conjecture, or fantasy." *See Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011). "We review an order granting summary judgment de novo." *Oppedahl v. Mobile Drill Int'l, Inc.*, 899 F.3d 505, 509 (8th Cir. 2018).

The Receiver's claims against Associated Bank are for aiding and abetting the torts of conversion, breach of fiduciary duty, fraud, and negligent misrepresentation — all under Minnesota law. Aiding and abetting is not an independent tort, but a theory of liability under which a party may be held jointly and severally liable for the underlying tort. *See Leiendecker v. Asian Women United of Minnesota*, 848 N.W.2d 224, 228 n.2 (Minn. 2014); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 185–86 (Minn. 1999).

Under Minnesota law, a plaintiff must show three things to hold a defendant liable for aiding and abetting a tort: first "the primary tortfeasor must commit a tort that causes an injury to the plaintiff," second "the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty," and third "the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Zayed I*, 779 F.3d at 733 (quoting *Witzman*, 601 N.W.2d at 187).

-4-

The parties do not dispute the first element, that the scammers committed torts. The question in this case is whether Associated Bank knew that the scammers were engaged in the tortious Ponzi scheme, and substantially assisted the scammers in achieving that scheme. *See id.* at 733.

## A. Knowledge of the Ponzi Scheme

### 1. Actual Knowledge

Under Minnesota law, the scienter (knowledge requirement) for aiding and abetting is "actual knowledge." *Varga v. U.S. Bank Nat. Ass'n*, 952 F. Supp. 2d 850, 857 (D. Minn. 2013) *aff'd*, 764 F.3d 833 (8th Cir. 2014) (applying Minnesota law). The evidence necessary to sufficiently show actual knowledge "depends in part on the particular facts and circumstances of each case." *Witzman*, 601 N.W.2d at 188. "[W]here there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Id.* (quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir.1991)). Courts consider "[f]actors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind." *Id.*

"While knowledge may be shown by circumstantial evidence, 'courts stress that the requirement is *actual* knowledge and the circumstantial evidence must demonstrate that the aider-and-abettor *actually knew* of the underlying wrongs committed.'" *Varga*, 952 F. Supp. 2d at 857 (quoting *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013)). A plaintiff must show more than "awareness of the conduct in question . . ., that it raised 'red flags,' . . . or even that it amounted to gross negligence," but must show that the defendant "was aware of the *wrongfulness* of the challenged conduct." *Id.* at 858 (citing *Camp*, 948 F.2d at 459, 463; *Wiand*, 938 F. Supp. 2d at 1244; *Witzman*, 601 N.W.2d at 188).

The summary judgment record contains no direct evidence Sarles or anyone at Associated Bank knew of the Ponzi scheme. In fact, all of the direct evidence was to the contrary. The Receiver's own expert witness agreed that "[there was] nobody at the bank who put this information together and determined there was a Ponzi scheme going on." Associated Bank's expert stated that he agreed with the Receiver's expert that "there is no one at Associated Bank who actually concluded . . . that the [scammers' entities] were engaged in a Ponzi scheme." David Martens, Associated Bank's regional security officer, testified based on his extensive law enforcement experience that he believed Sarles's actions were attributable to "sloppy banking" rather than anything "nefarious." Two of Sarles's coworkers testified that they did not observe anything that would indicate to them that Sarles knew about the Ponzi scheme. Ryan Rasske, Associated Bank's Director of Risk and Financial Crimes, testified that he had not uncovered any evidence that Sarles or anyone at Associated Bank knew of the Ponzi scheme. Furthermore, an employee of one of the scammers testified that she had no evidence Sarles knew of the Ponzi scheme. One of the scammers, Pettengill, said that Sarles was not part of the fraud. Another scammer, Cook, testified that Sarles "knew nothing about what was going on."

Given this absence of direct evidence, the Receiver attempted to amass circumstantial evidence that he claimed showed that Sarles had actual knowledge of the Ponzi scheme. But none of the circumstantial evidence compiled by the Receiver points to anything more than "sloppy banking" by Sarles or "red flags" that, with the benefit of hindsight, should have prompted further investigation or inquiry. Even on this twenty-seven volume, six-thousand page record, the leap cannot be made to infer that Sarles or anyone at Associated Bank actually knew about the Ponzi scheme without resorting to speculation and conjecture. *See Williams*, 889 F.3d at 931 (discussing the summary judgment standard).

Sarles first met Kiley, one of the scammers, around December 2007 when Sarles pitched him on switching his business's banking services to Associated Bank.

Sarles, who held the position of assistant vice president at Associated Bank, had the primary job duties of "marketing, opening new commercial accounts, and providing account management and services to new and existing commercial customers." Sarles first opened an account for Kiley for the entity Universal Brokerage FX Management, LLC in January 2008. Between then and June 2009, Sarles opened a total of eight accounts at Associated Bank for Kiley and fellow scammer Cook for different entities.

In June 2008, Sarles opened an account for "Crown Forex LLC" for Cook. The Receiver argues that the fact this account was opened in the name of a domestic entity shows that Sarles knew about the Ponzi scheme and was attempting to help the scammers avoid detection. According to Cook, he intended to open an account for Crown Forex, S.A., the Swiss investing entity, but Sarles suggested that he open it under the name of a domestic limited liability company. Cook explained that he did not think Sarles thought this was improper or fraudulent:

> [Sarles] certainly understood it was . . . a different entity, but . . . I don't think that he thought there was a fraud going on. . . . I think it's common that businesses have all kinds of holding companies and sub entities and different entities. . . . [W]e told him that . . . the Crown Forex, LLC account was part of Crown Forex, and it was on their books, so I'm not so sure I'd say [Sarles] knew something, you know, fishy was going on.

Sarles himself testified that he believed that in order for foreign business entities to open a bank account, "they have to have a domestic entity." He was merely following policy for foreign-owned corporations, and nothing in the record suggests Sarles thought that it was in any way illegitimate or fraudulent to open the Crown Forex account under the name of a domestic entity.

The Crown Forex LLC account was opened as a "checking/money market" account. The Receiver argues that opening this type of account was intended by

Sarles to help the scammers avoid detection. He claims that Sarles should have selected an account type that indicated fiduciary status or that it held investor funds. But the Receiver has not pointed to anything in the record that shows that Associated Bank had such specific types of accounts, much less policies requiring their use. In fact, the portfolio specialist who actually prepared the account opening form selected[3] the "checking/money market" option from a list of account types that also included "savings, time deposit, [and] loan account." The record does not support the claim that the Crown Forex account was nefariously opened as a checking account by Sarles or anyone else at Associated Bank to avoid detection and further the Ponzi scheme.

The Receiver also places great emphasis on the fact that Sarles opened the Crown Forex LLC account for Cook without receiving proof that the company was registered with the Minnesota Secretary of State. Sarles received all the necessary documentation, except for the proof of registration, but did receive an application for articles of incorporation which he was told was being submitted to the state. Sarles testified that he:

> receiv[ed] the application that was completed that was en route to be filed with the Secretary of State, therefore, the rapport and trust that I believed I had, I was providing above and beyond customer service to execute the client's request by opening up the account with the assumption I'd be receiving the state certificate within that two week period or so it takes to generate from the Secretary of State.

The account opening form, under the section for "documentation provided," listed "[r]eport from a state registration information website," although the specialist who opened the account was not sure if she typed that response or selected it from a drop-

---

[3] There is some evidence that Sarles directed (or that a banker in his position would typically direct) the selection of the account type. Assuming Sarles was responsible for the choice of account type, this fact still does not support the Receiver's allegation of actual knowledge.

down menu as "the one option that closest describe[d] the one item [of documentation] that we ha[d]." Sarles did not follow up on the missing paperwork. He said that after the Ponzi scheme was uncovered, he learned that Crown Forex LLC was never registered with the state. Of the eight accounts opened by the scammers at Associated Bank, only the Crown Forex LLC account and an account for Basel Group LLC were opened without certifying that the entities were registered with the state. Concluding that Sarles opened the Crown Forex and Basel Group accounts because he knew that Cook and others were engaged in a Ponzi scheme, rather than simply out of an effort to please an important client, would require speculation and is not a reasonable inference.

The Receiver also emphasizes that Sarles socialized with the scammers. The precise extent of that socialization is disputed, but none of the evidence supports an inference that Sarles learned about the Ponzi scheme through it. Interestingly, the Receiver also resorts to arguing that Sarles had knowledge of the Ponzi scheme because the scammers would sometimes quote lines about greed from movies like *Wall Street* and *Boiler Room*. This argument borders on absurdity and illustrates the lack of meaningful evidence that Sarles had knowledge of the Ponzi scheme. Quoting lines from movies about greed and scheming does not reveal one to be running a Ponzi scheme any more than quoting lines from *The Godfather* reveals one to be a mobster.

The receiver also claimed that Sarles duped a contractor who worked for the scammers into signing a blank account opening form. This assertion is unsupported by the record. The contractor never claimed the form was blank or that he was misled. The form he signed made him a signatory so he could cash checks and get a company credit card, as he had with their Wells Fargo account, in order to purchase supplies for the maintenance of the mansion in which the scammers conducted their business.

Another basis for the Receiver's claim that Sarles knew about the Ponzi scheme is the allegations by one of the scammers that Sarles was present at certain meetings. Pettengill claimed that around April 2008 he saw Sarles in attendance at an investment seminar at the Van Dusen mansion, although Sarles testified that he never attended any such seminars. The Receiver claims that a sophisticated banker like Sarles must have known that the investment pitch was a scam. But Pettengill admitted that Sarles did not say or do anything that would lead him to believe that Sarles did not believe the investment pitch or knew it was fraudulent.

Pettengill also claimed that Sarles attended a meeting in April or May 2008 at which the scammers discussed segregating client accounts. A closer look at this claim shows that it does not support an inference that Sarles knew the scammers were engaged in fraud. Pettengill himself said that he did not know client funds were being used to make up the shortfall in money until months after this meeting. Prior to the meeting, the scammers had been advised by their attorneys to "repaper" their client accounts by segregating their single, pooled bank account into separate client accounts. According to Pettengill, it was discussed that Associated Bank would facilitate the wire transfers from the Swiss Crown Forex account, back to the U.S. Crown Forex account, then back again into segregated client accounts in Switzerland. But Pettengill admitted in his deposition that the manner in which the transfers were to be done — by performing multiple transfers in order to cover up the shortfall of money in the Swiss account — was never disclosed to Sarles. Pettengill claimed that it was "implied" that they were covering up a shortfall of money, although he provides no support for this assertion. Even assuming Sarles knew there was a shortfall in the Swiss Crown Forex entity, and that the scammers wanted to avoid disclosing that, it does not follow that Sarles knew their enterprise was a Ponzi scheme or that they were engaged in tortious conduct. If true, this should have been a red flag, but it does not show actual knowledge. Moreover, Pettengill never claimed the scammers discussed in Sarles's presence using new clients' money to make up for the shortfall in the Swiss Crown Forex account. Pettengill's testimony

-10-

is insufficient to support an inference that Sarles knew the scammers were engaged in tortious conduct.

The Receiver also claimed Sarles improperly approved transfers of money between bank accounts for the scammers. Specifically, he claims that Sarles approved transfers at Cook's behest from the Crown Forex accounts, on which Kiley and Smith — but not Cook — were signatories, into accounts on which Cook was a signatory. Only three of the transfer forms cited by the Receiver, however, actually reference Cook. Assuming that Sarles authorized these transfers for Cook, there is still no evidence that the account signatories did not approve of these transfers. Smith would at times transfer money by forwarding emailed directions from Cook to the bank. Even if Sarles had transferred money at Cook's behest on an account on which Smith was the signatory, this would only show that he was being sloppy with formalities when he knew that Cook and Smith (and the other scammers) were working together — it would not show that Sarles knew there was a Ponzi scheme afoot. Additionally, in June 2009, Cook requested a $600,000 withdrawal from the Oxford Global account, on which he was a signatory. The withdrawal was approved only after Sarles contacted his supervisor and the bank ensured that all procedures had been properly followed. Nothing about these transfers or the withdrawal suggest that Sarles knew about the Ponzi scheme.

The Receiver argues that in 2009, money continued to flow in and out of the Crown Forex account, even "after Sarles had learned that Swiss authorities had shut down Crown Forex, S.A., rendering the sole investment vehicle of the scheme obviously impossible." But the record contains no evidence to support the claim that Sarles knew the Swiss entity had been shut down. In fact, the Receiver's own expert report states that if Associated Bank had the proper due diligence procedures, it *would have* learned of this information, but does not claim that anyone at the bank actually did learn of it.

-11-

Finally, the Receiver argues in his brief that just before Sarles was fired, "the Bank itself began a drumbeat of instructions to Sarles to delete emails – prohibiting him from using the email account unless he did so," and that "[n]othing indicates that Sarles failed to destroy these documents, as the Bank instructed him to do." Examination of these emails shows they are not the nefarious messages the Receiver makes them out to be. Rather, they are standard notifications that the storage on Sarles's email inbox was full, sent by the bank's Microsoft Exchange Server. Moreover, prior to these notifications and Sarles's termination, his email inbox was preserved and reviewed by a bank security officer, which revealed "[n]othing out of the ordinary." The characterization of these emails by the Receiver to this Court is, at best, misleading. Sarles's full inbox does not show him to be aware of the Ponzi scheme or that the bank was attempting to cover anything up.

In sum, the evidence cited by the Receiver simply does not support a reasonable inference that Sarles or anyone at Associated Bank had actual knowledge of the scammers' torts. Nor does looking to all the circumstantial evidence collectively allow for such a conclusion without resorting to speculation and conjecture. After all, "in law as in mathematics zero plus zero equals zero." *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001).

## 2. Constructive Knowledge

The Receiver alternatively argues that he need not show that Associated Bank had actual knowledge of the scammers' torts to impose aiding and abetting liability, but that "constructive knowledge" is sufficient. We disagree, but in any event, the summary judgment record here is insufficient to support a finding of constructive knowledge.

The Receiver rests his constructive knowledge argument on a single reference in the Minnesota Supreme Court's opinion in *Witzman*, in which the Court stated

-12-

while discussing aiding and abetting liability that "some courts" have found that a defendant may be deemed to have constructive knowledge of a tort "where the primary tortfeasor's conduct is clearly tortious or illegal," where "[the] defendant [has] a long-term or in-depth relationship with that tortfeasor," and "where the conduct is [] a facial breach of duty." 601 N.W.2d at 188. After making this observation, however, the Court in *Witzman* applied an actual knowledge test. *Id.* We agree with the district court in *Varga*, 952 F. Supp. 2d at 857, that under Minnesota law, "[c]onstructive knowledge will not suffice."

Even assuming that constructive knowledge could be sufficient, it cannot be imputed to Sarles and Associated Bank on this record. The actions of the scammers known to Associated Bank were not "clearly tortious or illegal." Rather, what was later revealed to be a fraud was a sophisticated Ponzi scheme that went undetected for years. Nor did Sarles or Associated Bank have "a long-term or in-depth relationship" with the scammers. The professional relationship between the scammers and Sarles and the bank, even with Sarles's socializing, does not meet this standard. Nor was the Ponzi scheme "a facial breach of duty." On its face, it appeared to be a legitimate investing business. Thus, a finding of constructive knowledge could not be supported by this record, even if constructive knowledge was sufficient under Minnesota law to impose aiding and abetting liability.

## B. *Substantial Assistance in the Scheme*

In addition to showing actual knowledge, a plaintiff must show that a defendant provided substantial assistance to the primary tortfeasor in order to impose aiding and abetting liability. *Witzman*, 601 N.W.2d at 188–89. This element is evaluated in tandem with the knowledge requirement. *Id.* Thus, the weaker the evidence of knowledge is, the greater the showing of substantial assistance must be. *See id.* "[C]onduct that inadvertently advances the [underlying tort] does not amount to substantial assistance." *Varga*, 764 F.3d at (quoting *Camp*, 948 F.2d at 460). In

-13-

addition, "'[s]ome element of blameworthiness' must be present in the defendant's assistance." *Id.*

The Minnesota Supreme Court has said that in the context of professionals, "'substantial assistance' means something more than the provision of routine professional services." *Witzman*, 601 N.W.2d at 189. The Court in *Witzman* said that allegations against the defendant, an accounting firm, involved nothing more than the "performance of routine accounting duties," and went on to say: "If we were to recognize that such routine services constitute substantial assistance, then it would be the rare accountant indeed who would not be subject to automatic liability merely because his client happened to be a tortfeasor." *Id.* The same could easily be said of banks.

While the Receiver's claim fails because of the lack of evidence of actual knowledge, we also conclude that no reasonable factfinder could conclude that Associated Bank provided substantial assistance to the scammers in the commission of their torts. The evidence that the Receiver claims shows substantial assistance is largely the same evidence it claims shows knowledge. The substantial assistance element is found wanting for many of the same reasons as the knowledge element. The record shows nothing beyond the provision of routine banking services or, at worst, sloppy banking. The bank provided nothing beyond its standard professional services to assist the scammers in perpetrating their Ponzi scheme. No reasonable factfinder could conclude that Associated Bank provided substantial assistance to the scammers' tortious conduct.

### III. Conclusion

To show a genuine dispute of material fact, a party must provide more than conjecture and speculation. The Receiver has not done so. We affirm.


KELLY, Circuit Judge, dissenting.

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Tolan v. Cotton, 572 U.S. 650, 656 (2014) (per curiam) (quoting Anderson, 477 U.S. at 249). And it is "axiom[atic] that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Id. at 651 (second alteration in original) (quoting Anderson, 477 U.S. at 255). Our task at summary judgment is particularly delicate where, as here, the record is fact-intensive and much of the evidence is circumstantial. After all, we have explained that "[a] given piece of circumstantial evidence may equally support many inferences," and it is a "fallacy" to "assum[e] that only inferences that are more probable than other inferences may be drawn from [such] evidence." Grinder v. S. Farm Bureau Cas. Ins. Co., 590 F.2d 741, 744 (8th Cir. 1979). The "drawing of legitimate inferences"—that is, deciding *which* of the permissible inferences ultimately to draw—is a function for the jury. Anderson, 477 U.S. at 255. Our task here is simply to assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. In my view, the evidence here is not "so one-sided," and I would reverse the judgment of the district court and allow the Receiver's claims to proceed to trial.

When properly viewed in the light most favorable to the Receiver, the record reveals a genuine dispute of material fact as to both (1) whether Sarles actually "kn[ew] that the primary tortfeasor[s'] conduct constitute[d] a breach of duty;"[4] and (2) whether he "substantially assist[ed] or encourage[d] the primary tortfeasor[s] in the achievement of the breach." Zayed I, 779 F.3d at 733 (quoting Witzman, 601 N.W.2d at 187). As the court notes, we evaluate these elements in tandem, Witzman, 601 N.W.2d at 188, and both can be proved by circumstantial evidence, K & S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 977 (8th Cir. 1991); Ariola v. City of Stillwater, 889 N.W.2d 340, 356–57 (Minn. Ct. App. 2017), review denied (Apr. 18, 2017). "[W]here there is a minimal showing of substantial assistance, a greater showing of scienter is required." Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991) (quoting Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985)). "Factors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind all come into play." Witzman, 601 N.W.2d at 188.

I.

Here, the Receiver has "present[ed] evidence from which a jury might" conclude that Sarles knew that the principals were committing the torts of conversion, breach of fiduciary duty, fraud, and false representations, and that he substantially assisted them in committing those torts. Anderson, 477 U.S. at 257. Viewed in the light most favorable to the Receiver, the record demonstrates that Sarles was intimately aware of the principals' business (which was a fraud); took action to assist

_____

[4]Were it necessary to reach the issue, I would be inclined to agree with the court that Minnesota does not recognize a "constructive knowledge" standard. But it is unnecessary to resolve that issue now because there is substantial circumstantial evidence from which a jury could reasonably conclude that Sarles had *actual* knowledge of the principals' tortious conduct.

them in furthering their tortious conduct; and was unusually close with the principals, and with Cook in particular.

For instance, a jury could reasonably conclude that Sarles knew of the tortious conduct based in part on his attendance at several key meetings in 2008. Pettengill testified that around April 2008, he saw Sarles at an investment seminar, which Sarles attended to "see what [the principals] did." As we have previously described, the principals would pitch a "risk-free," "completely safe" investment scheme that duped investors into believing that "they would be investing in foreign currency trading, which was guaranteed and had a fixed rate every month." Beckman, 787 F.3d at 475 (cleaned up). Sarles was an experienced banker who had received bank secrecy and anti-money laundering training. At the very least, a jury could reasonably conclude that from this point on, Sarles began to gather sufficient information to know that the principals were dishonest and pitching a scam. The court, however, dismisses this evidence because Pettengill agreed that Sarles said nothing at the seminar to indicate he (Sarles) knew the pitch was fraudulent. But Pettengill said that his only interaction with Sarles at the seminar was to exchange a simple greeting, and that it was before the seminar even began.

After the investment seminar, Sarles attended a critical meeting where, according to Pettengill, the principals made Sarles aware of two key facts: (1) that the Swiss Crown Forex S.A. account had a $2 million balance that they needed to make appear as a $15 million balance through a "repapering" effort involving wire transfers from the insolvent Swiss account to a U.S. account; and (2) that they needed a "friendly banker" to "make it look clean" and "get around Wells Fargo's questioning all the wire transfers" and that bank's growing suspicions. According to Pettengill, Sarles "agree[d] to the process," which was impliedly illegal, and said something along the lines of, "Yes, I can move the money in this way." Again according to Pettengill, Cook said that Sarles "[is] going to be our new banker. . . . And he will do whatever we need to do to open accounts and do the wire transfer and do whatever

we need[] to have done." Pettengill's impression was that Cook chose to work specifically with Sarles because Sarles "was our guy and . . . would do whatever Cook wanted, even if it was legal or illegal."

The timing of these events is important. It was after attending the seminar and the above-described meeting that Sarles helped the principals open several accounts that became central to the principals' torts. The first was the U.S. Crown Forex LLC account. Kiley and Smith were the only signatories on the account, but Sarles opened it at Cook's direction. Sarles knew that the account was supposed to hold investor funds, yet evidence in the record indicates that it was opened as a "Checking/Money Market" account. Moreover, although the account-opening form states that a "[r]eport from a state registration information website" had been received to verify LLC status, Sarles admitted that "when [he] opened the Crown Forex LLC account, [he] was not provided with Secretary of State registration documentation," in violation of Associated Bank's procedures. It is true, as the court notes, that Sarles testified that all he was doing by opening the account without proper documentation was providing "above and beyond customer service." But it is not up to us to definitively credit this testimony where there is conflicting evidence in the record.[5] Although Sarles claims he expected to receive the required documents at a later date,

_____

[5]There is plenty of evidence impeaching Sarles's credibility, including his conflicting testimony about the nature of his social interactions with the principals. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (noting that at summary judgment, courts "must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'" (citation omitted) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 (2d ed.1995))). Moreover, at least two witnesses suggested that Sarles asked them to sign blank bank forms—or, in other words, that he opened accounts without required documentation.

he never received them and he never followed up. After assessing the credibility of those involved, a jury could reasonably conclude that this evidence supports a finding that Sarles had knowledge of the principals' tortious conduct. See Anderson, 477 U.S. at 255 ("[C]redibility determinations . . . and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

After opening the Crown Forex LLC account, Sarles opened four more accounts associated with the scheme. These accounts contained a variant of the name "Oxford,"[6] had the same address, and were opened within a three-month period. According to Sarles, Cook told him that one of these accounts, Oxford Global FX, on which Cook was the sole signatory, would not hold investor funds. Leo Domenichetti, a contractor hired to perform general maintenance on Cook's properties, was also a signatory on one of the Oxford Global accounts. This was so even though he had no substantive role in the principals' "business." According to Domenichetti, Sarles directed him to sign an account form that he had not read. Domenichetti also said that, when he signed it, portions of the form were covered up, and the other signatories' lines were blank. Domenichetti also testified that the "Administrative Assistant" title that was next to his name on the form—a title Domenichetti characterized as "baloney"—was added after he signed it.

The circumstances surrounding the opening of the Oxford accounts are not insignificant.[7] A jury, of course, would be entitled to give this evidence little weight,

---

[6]For example, Oxford Global Investments Inc., Oxford Global Partners LLC, and Oxford Global FX, LLC.

[7]In fact, David Martens, who was employed in bank security at Associated Bank while the fraud unfolded, testified that the opening, within a short time period, of multiple bank accounts with similar names listing the same address might evince fraud. Although he characterized Sarles's conduct as nothing but "sloppy banking," the drawing of ultimate conclusions from Martens's testimony is a function for the jury.

or to decline to draw an inference of knowledge from these facts. But at this juncture, we can do neither.

A reasonable jury could also consider the evidence that Sarles personally assisted Cook in improperly transferring millions of dollars from investor accounts to Cook's account. For instance, on April 30, 2009, Sarles approved Cook's request to transfer $1.7 million of investor funds from the Crown Forex LLC account (on which Cook was not a signatory) to Cook's Oxford Global FX account (on which he was the sole signatory).[8] Substantial record evidence, including from Associated Bank security employees, indicates that Sarles's approval of that transfer violated bank policy and industry standards. This improper transfer went undetected until Cook sought to withdraw $600,000 of that $1.7 million, in cash, to buy a yacht. At that point, the transfer caught the attention of other bankers. Associated Bank Senior Vice President Steven Bianchi halted the $600,000 withdrawal. He explained that Cook could not withdraw the money because the funds came from the $1.7 million that had been improperly transferred by Sarles. He explained:

> The [$1.7 million] should have been transferred by Crown Forex with an internal wire transfer instead of [the] internal bank transfer [approved by Sarles]. *Because ownership and signers are not the same or overlapping*, the money should be deposited into Oxford Global via check or wire. *The accounts are not related.* Therefore, the transfer will be reversed (money taken out of Oxford Global and returned to Crown Forex) and Crown Forex will be instructed to transfer via internal wire transfer the $600,000 in question. After this internal wire has been verified, I will provide approval for this order to purchase cash.

(emphasis added).

---

[8] Smith initiated the request, but the record shows Cook directed her to do so.

Associated Bank ultimately permitted Cook to leave the bank with $600,000 of investor funds, but the process leading up to that withdrawal is relevant to the analysis. I respectfully disagree with the court's conclusion that this evidence suggests Sarles "contacted his supervisor" to ensure that "all procedures had been properly followed" before Cook could withdraw the $600,000. To the contrary, when viewed in the light most favorable to the Receiver, this evidence suggests that Sarles directly assisted Cook—in violation of bank policy and industry standards—in withdrawing investor funds for Cook's own use. Moreover, this improper transfer (and withdrawal) is not an outlier. Record evidence shows Sarles approved additional transfers of $1 and $2 million of investor funds from the Crown Forex LLC account to Cook's own Oxford Global FX account. The jury—not judges—must evaluate and weigh this evidence.

In determining whether there is sufficient evidence of knowledge, both the relationship between Sarles and the "primary tortfeasor[s]" and Sarles's "state of mind . . . come into play." Witzman, 601 N.W.2d at 188. Repeatedly, Pettengill indicated that the principals created an environment where the "operation" was seen as a "'game' to get people's money." Pettengill "knew that things weren't right from the beginning," even if he did not know the precise "details" and "extent" of the fraud until later. According to Pettengill, Sarles too was immersed in this environment. Pettengill stated that he saw Sarles at the Van Dusen mansion "perhaps a dozen times," and with Cook "around six times discussing business and drinking."[9] As to these interactions, Pettengill said, "[m]any times we would just hang out in Cook's office and we . . . would just be drinking and [Cook] would spout off on, you know, 'Greed is good'" and quote movie lines about greed and money. The point of this evidence is not whether Sarles knew about the tortious conduct simply because he heard the principals recite movie lines. The point is whether a jury could reasonably

_____

[9]Sarles himself testified that he spoke to Cook on the phone at a "minimum" once a week, and often more frequently than that.

-21-

infer that Sarles knew of the tortious conduct based, at least in part, on his active participation in an atmosphere where greed was openly glorified and getting people's money was viewed as a game—a 193-million-dollar game that cost some victims their entire life savings. See Beckman, 787 F.3d at 474.

To be sure, each individual piece of evidence described above, standing alone, may not be sufficient to indicate Sarles knew of every detail of the Ponzi scheme and its full extent. But the case before us is for aiding and abetting the *specific* torts of breach of fiduciary duty, conversion, false representation, and fraud. Associated Bank, in fact, concedes that these specific torts were "committed by the operators of a Ponzi scheme who stole investors' money from 2006 until 2009." When viewed as a whole, see Reeves, 530 U.S. at 151, the evidence could lead a reasonable jury to conclude that Sarles knew that the principals' conduct constituted each of the alleged torts.[10] A jury could conclude that Sarles knew of the principals' breach of fiduciary duty because, among other things, he helped Cook withdraw hundreds of thousands of dollars of investor funds for use inconsistent with the funds' intended purpose and helped the principals implement an illegal scheme designed to mask a $13 million shortfall of investor funds. Cf. Reisdorf v. i3, LLC, 129 F. Supp. 3d 751, 767 (D. Minn. 2015) (Under Minnesota law, "[f]iduciary duty requires officers and directors 'to act in good faith, with honesty in fact, with loyalty, in the best interests of the [beneficiary].'"); Vacinek v. First Nat'l Bank of Pine City, 416 N.W.2d 795, 799 (Minn. Ct. App. 1987) (explaining that fiduciary relationships are characterized by two attributes: "superiority of knowledge of one party and confidence reposed by the other").

_____

[10]Regrettably, the Receiver fails to engage in the required tort-by-tort analysis in its brief, even though he argues that the district court erred in failing to analyze the claims individually. The fact that Associated Bank concedes the principals committed the torts, but neither party elaborates on this point, further complicates our task at summary judgment.

A jury could also conclude that Sarles had knowledge of the tort of conversion based on this same evidence, that is, that he personally assisted the principals in transferring (and withdrawing) at least $600,000 of investor funds for Cook's own use. See Rudnitski v. Seely, 452 N.W.2d 664, 668 (Minn. 1990) ("Conversion is the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods."). Similarly, a jury could find that Sarles had knowledge of the tort of false representations because he knew what the principals promised investors, but also knew that investor funds were being misused. See Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986) (listing the elements of an affirmative misrepresentation claim in Minnesota as requiring that: "(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation . . . ; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance").

Sarles's knowledge of the fraud claim presents a closer call. The Receiver's complaint alleges the fraud claim specifically as a "Ponzi scheme"—a type of fraud in which "the operator promises investors returns on their investment which the operator intends to pay from funds provided by new investors, rather than from profits generated by the underlying business venture." In re Armstrong, 285 F.3d 1092, 1093 n.3 (8th Cir. 2002). In my view, however, Sarles's willingness to help the principals open accounts to make a $2 million balance appear as a $15 million balance coupled with the other evidence of banking improprieties prevents us from concluding, as a matter of law, that he had no knowledge of the Ponzi scheme.

As the court notes, the evidence in this case is largely circumstantial. But refusing to submit to a jury circumstantial evidence of the type found here comes far too close to impermissibly requiring *direct* evidence of actual knowledge even where circumstantial evidence in fact can and may suffice. See United States v. Hirani, 824

F.3d 741, 747 (8th Cir. 2016) ("In both civil and criminal cases, circumstantial evidence is considered just as probative as direct evidence . . . ."). Moreover, as we have often explained, fact-intensive inquiries, in particular those containing a knowledge component, "[are] generally inappropriate for summary judgment." Best Buy Stores, L.P. v. Benderson-Wainberg Assocs., L.P., 668 F.3d 1019, 1030 (8th Cir. 2012) (reversing grant of summary judgment on affirmative defenses containing knowledge as an element). "[A] non-moving party survives summary judgment when the facts, while thin, enable a jury to draw a reasonable inference for its claim." Hill v. Sw. Energy Co., 858 F.3d 481, 487 (8th Cir. 2017) (cleaned up).

II.

The above-described circumstantial evidence could also lead a jury reasonably to conclude that Sarles substantially assisted the principals' torts. To qualify under Minnesota law, "[a]ssitance must further the [tort] itself, and not merely constitute general aid to the tortfeasor." Zayed I, 779 F.3d at 735 (cleaned up). "'[S]ubstantial assistance' means something more than the provision of routine professional services." Witzman, 601 N.W.2d at 189. Viewing the evidence in the light most favorable to the Receiver, a jury could reasonably conclude that Sarles did more than provide the principals with ordinary banking services. He opened accounts—without the proper documentation—to assist them in an illegal "repapering" effort after Wells Fargo had grown suspicious of the principals' banking activity. He helped Cook transfer and withdraw large sums of investor funds for his own use and in violation of Associated Bank's policies and industry standards. Cf id. (holding that the plaintiff failed to state a claim when "[t]he only 'assistance'" she alleged was "performance of routine accounting duties—i.e., preparing financial statements," etc.). Assessed in tandem with the evidence of Sarles's knowledge of the principals' "business model" promising risk-free and guaranteed returns, and viewed in the light most favorable to the Receiver, this evidence suggests that Sarles was far more than a mere bystander. Cf id. ("The mere presence of the particular defendant at the

-24-

commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility." (cleaned up)).

In sum, I believe the Receiver has presented sufficient evidence to defeat summary judgment. Accordingly, I respectfully dissent.

_____