# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1054

_____

Timothy Cronin

*Plaintiff - Appellant*

v.

Chris Peterson, in his individual capacity;
Tonya Peters, in her individual capacity; William Koepke, in his individual
capacity; Daren Reynolds, in his individual capacity

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: September 24, 2020
Filed: December 18, 2020

_____

Before KELLY, WOLLMAN, and STRAS, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The Lincoln, Nebraska, Police Department received allegations that Lincoln police officer Timothy Cronin had purchased illegal steroids and interfered with another police department's investigation of a nutritional supplement purveyor in Ohio. Cronin was thereafter interviewed; his home, police locker, police cruiser, and

wife's vehicle were searched; and his blood and urine were taken and analyzed. Cronin later filed suit, alleging several claims under 42 U.S.C. § 1983. As relevant to this appeal, the district court[1] dismissed Cronin's claim that Sergeant William Koepke had unlawfully detained Cronin in violation of his Fourth Amendment rights. The court granted summary judgment in favor of the defendants on Cronin's Fourth Amendment claims that Koepke had unlawfully arrested Cronin; that Captain Chris Peterson and Legal Advisor Tonya Peters had omitted material facts from their warrant application; and that Sergeant Daren Reynolds had searched Cronin's wife's vehicle, which was not the vehicle identified in the search warrant. We affirm.

## I. Background

In September 2015, the Lincoln Police Department received a complaint from the Nebraska Crime Commission alleging that a detective in Ohio believed that Cronin was interfering with the detective's investigation into alleged illegal steroid sales by a nutritional supplement store owner in Powell, Ohio. The Ohio detective had seized the store owner's cellphone and discovered extensive text messages between the owner and a phone number associated with Cronin. Based on these text messages, the detective believed that Cronin had purchased illegal steroids for himself and a coworker and was impeding the detective's investigation by advising the store owner on how to frustrate interactions with the police. When Lincoln's assistant police chief contacted Cronin to advise him of the complaint, Cronin confirmed that he had a friend in Ohio whom Cronin had instructed to contact an attorney about issues with a search warrant related to the friend's business.

Meanwhile, Lincoln's police chief received the same complaint. He referred the matter to the internal affairs department, which contacted the Ohio detective. The

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

detective described his investigation and provided copies of the text messages at issue. The text messages used terms that the detective believed showed the exchange of both legal and illegal steroids between Cronin and the store owner. The police chief then directed internal affairs to obtain an opinion on the text messages from Peterson, the Lincoln narcotics unit captain. Although Peterson's only steroid-specific training occurred prior to 1997 and totaled fewer than 5 hours, he had 25 years of police experience, which included 13 years of general narcotics experience. Peterson agreed with the Ohio detective, believing that the text messages' terms, "ana," "anavar," "var," "pct," "clomid," "nolvadex," "juice," and "light steroid," were associated with anabolic steroids, which are controlled substances under Nebraska law. Neb. Rev. Stat. §§ 28-405, 28-416(3). Peterson also believed that Cronin's text messages about avoiding "gyno risk" by using "clomid" and "novadex" referred to steroids' effect on testicle size.

Peterson, Legal Advisor Peters, the police chief, and the assistant police chief met to discuss Peterson's assessments. The police chief then directed the Lincoln narcotics unit to conduct a criminal investigation. Peterson met with two narcotics investigators, Sergeants Reynolds and Koepke, to begin the investigation. Reynolds went to Cronin's home to await consent to search it or the issuance of a warrant. Koepke headed to Cronin's substation to interview him. With Peters's assistance, Peterson began to draft search warrant affidavits for use if Cronin denied consent to various searches.

Koepke met with Cronin in a conference room at the substation. Although the exact timeline is disputed, the following events occurred during the next few hours: Koepke interviewed Cronin; the police obtained warrants to search Cronin's home, personal and police vehicles, police locker, and person based on affidavits prepared by Peterson and Peters; the police obtained Cronin's blood and urine samples; and Reynolds and another officer searched Cronin's home and Cronin's wife's Ford Escape. Although Cronin drove the Ford Escape to work every day and parked it in

the police department lot, it was not the car identified in the search warrant. The police also later obtained a warrant and warrant extensions to search Cronin's cellphone. The investigation continued over the next few months, but no charges were ever brought against Cronin and he remained employed by the Lincoln Police Department.

## II. Analysis

Qualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Blazek v. City of Iowa City, 761 F.3d 920, 922 (8th Cir. 2014) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity involves the following inquiries: (1) whether the facts, when "viewed in the light most favorable to [the plaintiff], establish[] a violation of a constitutional or statutory right," and (2) whether "the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful." Id. at 922-23 (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)) (qualified immunity standard on summary judgment); see also Lane v. Nading, 927 F.3d 1018, 1022 (8th Cir. 2019) (qualified immunity standard on dismissal). For Cronin "to establish a § 1983 claim for a Fourth Amendment violation, he must demonstrate [that] a search or seizure occurred[] and [that] the search or seizure was unreasonable." Clark v. Clark, 926 F.3d 972, 977 (8th Cir. 2019) (citing McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003)).

A. Unlawful Detention Claim Against Koepke

Cronin first argues that the district court erred in dismissing his claim that Koepke violated Cronin's Fourth Amendment rights when Koepke initially detained him in the substation conference room.

We review *de novo* the district court's order granting a motion to dismiss. Alexander v. Hedback, 718 F.3d 762, 765 (8th Cir. 2013). We accept the complaint's factual allegations as true and construe all reasonable inferences in favor of the plaintiff. Id. Dismissal is appropriate if the complaint fails to plead sufficient facts to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A police officer can "briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). In forming reasonable suspicion, an officer "may rely on information provided by other officers and all the information known to a team of officers involved in the investigation." United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (citing United States v. Robinson, 119 F.3d 663, 666-67 (8th Cir. 1997)).

Cronin's complaint alleged that his police work involved participating in narcotics investigations. It stated that the Lincoln Police Department had purportedly received a complaint alleging that Cronin had interfered with an Ohio investigation into a supplement store owner's alleged distribution of illegal steroids. See Kramer v. City of Jersey City, 455 F. App'x 204, 205–06 (3d Cir. 2011) (granting qualified immunity to members of the Jersey City Police Department who had taken JCPD officers into custody and required a urine sample after the New York City Police Department informed JCPD that some of its officers might be purchasing illegal steroids); see also Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 670 (1989) ("[T]he Government has a compelling interest in ensuring that front-line [drug] interdiction personnel . . . have unimpeachable integrity and judgment."). The complaint further alleged that Peterson had received and reviewed copies of text messages between Cronin and his friend, the supplement store owner. It stated that Koepke was assisting Peterson in his investigation of Cronin. See United States v. O'Connell, 841 F.2d 1408, 1419 (8th Cir. 1988) ("[When officers] worked closely

together during the investigation for the warrant[,]. . . we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person, even if the acting officer is unable to completely and correctly articulate the grounds for his suspicion at the time of the search." (internal citations omitted)). Although the complaint characterized the texts as "vague and ambiguous," it acknowledged that Cronin had purchased supplements.

Taken together, these facts do not establish that Koepke lacked sufficient reasonable and articulable suspicion that Cronin might be involved in criminal activity. We thus conclude that the initial detention was not unconstitutional and that Koepke was entitled to qualified immunity.

B. Summary Judgment Claims

We also review *de novo* the district court's qualified-immunity grant of summary judgment. Schaffer v. Beringer, 842 F.3d 585, 591 (8th Cir. 2016). We view the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. Id. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

1. Unlawful Arrest Claim Against Koepke

Cronin argues that the district court erred in granting summary judgment on Cronin's claim that Koepke arrested him without probable cause. Cronin contends that, even if the initial stop and detention were valid, the prolonged detention eventually turned into an unconstitutional *de facto* arrest.

An investigative detention may become "an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." United States v. Donnelly, 475 F.3d

946, 953 (8th Cir. 2007) (internal quotation marks and citation omitted). During such a detention, "officers should 'employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' of the temporary seizure." United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)).

Cronin contends that his detention was unreasonably lengthy and exceeded the scope of an investigatory stop. In determining whether a detention is excessively long, we consider the "law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." United States v. Sharpe, 470 U.S. 675, 685 (1985). Koepke had reasonable suspicion that Cronin had purchased illegal steroids and interfered with an investigation. Accordingly, the purpose of the investigatory stop was to gather information to help the police confirm or dispel that suspicion, the accomplishment of which Koepke pursued diligently. While in the substation conference room, Koepke explained the allegations that Cronin had purchased illegal steroids and had interfered in an Ohio investigation. He asked whether Cronin would consent to a urine test. Once the warrant for Cronin's blood and urine was issued, Koepke took Cronin to the hospital for the tests, returned him to the substation after the tests were completed, and immediately released him.[2] Koepke did not handcuff Cronin and drove him to the hospital in an unmarked minivan, with Cronin clad in plain clothes and seated in the front seat. See United States v. Bloomfield, 40 F.3d 910, 916–17 (8th Cir. 1994) (en banc) (listing factors, like handcuffing and confining the suspect within a police car, that can transform a detention into an unlawful *de facto* arrest). Although Cronin argues that the detention should have ended when Koepke began to believe that there was a misunderstanding

---

[2]Cronin claims that Koepke caused him to be fearful and humiliated during the urine test. The urine was obtained pursuant to a warrant, and we conclude that the urine collection did not result in a *de facto* arrest.

about the illegality of Cronin's alleged activity, the detention was nonetheless objectively reasonable. Koepke's individual, subjective beliefs about Cronin's guilt or innocence are not relevant to the reasonableness of Cronin's detention and alleged arrest. Bowden v. Meinberg, 807 F.3d 877, 881 (8th Cir. 2015).

Despite disputed facts about who caused the alleged delay in obtaining the blood and urine search warrant, the length of the stop was nonetheless reasonable because any delay was not within Koepke's control. Cronin himself partly contributed to the stop's length. While in the conference room, Cronin explained his side of the story and spent time searching the internet for the substances mentioned in his text messages. He gave and withdrew consent to provide a urine sample. He also called his wife, called the police union attorney twice, and texted a friend. See United States v. Montoya de Hernandez, 473 U.S. 531, 542–44 (1985) (describing a nearly sixteen-hour detention as reasonable because of the nature of the suspected illegal activity and the suspect's dilatory actions). Moreover, we conclude that Cronin has failed to produce evidence sufficient to show that certain delays—the lengths of time it took for the warrants to issue and for the hospital staff to take and process the blood and urine samples—were within Koepke's control. See United States v. Morris, 910 F. Supp. 1428, 1442 (N.D. Iowa 1995) (concluding, in a motion to suppress context, that a valid detention "does not become unreasonable in length as long as the stopping officer uses diligent efforts to process the stop and further delays are the result of circumstances beyond the officer's control").

We therefore conclude that Koepke was entitled to qualified immunity because the length of Cronin's detention was not unreasonable under the circumstances.

2. Invalid Search Warrant Claim Against Peterson and Peters

Cronin next argues that the district court erred in granting summary judgment in favor of Peterson and Peters on his invalid search warrant claim. He contends that

Peterson and Peters violated <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), by omitting material facts from the warrant applications.

The Supreme Court held in <u>Franks</u> that a Fourth Amendment violation occurs when "(1) a law enforcement officer knowingly and intentionally, or with reckless disregard for the truth, include[s] a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause." <u>United States v. Neal</u>, 528 F.3d 1069, 1072 (8th Cir. 2008) (citing <u>Franks</u>, 438 U.S. at 155–56). "This rationale also applies to information that the affiant deliberately or with reckless disregard for the truth omits from the affidavit such that the affidavit is misleading and insufficient to establish probable cause had the omitted information been included." <u>Id.</u> (citing <u>United States v. Jacobs</u>, 986 F.2d 1231, 1234 (8th Cir. 1993)).

As an initial matter, the first set of search warrant affidavits established probable cause to search Cronin's house, person, police vehicle and locker, and personal vehicle. <u>See</u> <u>United States v. Augustine</u>, 663 F.3d 367, 372 (8th Cir. 2011) ("For probable cause to be shown, the warrant application and affidavit must describe circumstances showing that, based on practical experience and common sense, there is a fair probability that contraband or similar evidence will be found in the targeted place." (internal citation omitted)). The affidavits stated that the Ohio detective was investigating a supplement store suspected of selling illegal steroids; that the detective had seized from the store suspected illegal steroids; that the detective had served a search warrant on the supplement store owner; that the warrant uncovered a series of text messages between the store owner and a phone number belonging to Cronin; that the store owner was Cronin's friend; that the text messages appeared to show Cronin both advising the owner on how to interact with the police and discussing which substance to use, where to obtain it, and how much it would cost; that in Peterson's professional opinion those text messages also outlined the negotiation, purchase, and use or sale of illegal steroids; and that Cronin had written

a check to the store owner. The affidavits also stated that Peterson was responsible for reviewing the officer misconduct complaint; that Peterson had more than twenty-four years of police experience with thirteen years of narcotics experience; that Peterson received narcotics training from various local, state, and federal agencies; that Peterson had spoken with a detective from Ohio about the investigation; that despite Cronin's submission of a website from which he had purchased "anabol," Peterson could not determine the legality of the product; that Cronin admitted purchasing products from a friend's supplement store; that Peterson could not find a website selling "anavar"; and that Peterson knew that steroids can be manufactured and purchased through illegal means.

Cronin alleges that Peterson and Peters omitted the following facts from the affidavits for the first set of search warrants: that Koepke believed that the substances referred to in the text messages were legal and that the investigation was merely a misunderstanding; that Cronin stated that there were no substances at his home because he consumed them all; that Peterson's steroid investigation training and experience was brief and dated; and that the nature of the supplement market makes it difficult to tell if a substance is legal or illegal.[3]

The inclusion of Cronin's additional details would not have negated the existence of probable cause. The affidavits contained corroborated information received from another police department that indicated a fair probability that evidence of illegal steroid possession or use would be found.[4] See Neal, 528 F.3d at 1072–73

---

[3]Cronin revised his list of alleged omissions over the course of this litigation, adding the third and fourth omitted facts at the summary judgment stage.

[4]Cronin asserts that the alleged omissions were made deliberately or recklessly. Any asserted intent is immaterial because Cronin has failed to produce evidence sufficient to show that any omissions were "clearly critical" to a probable cause determination. Schaffer, 842 F.3d at 594 (internal citation omitted).

(concluding that in a <u>Franks</u> motion to suppress context, we consider both the affiant's actions and "the actions of the local law enforcement officers who provided information for . . . the affidavit").  Further, even if Peterson and Peters knew that Koepke, a non-affiant, allegedly believed that the substances were all legal, Peterson and Peters were not required to include Koepke's opinion in the affidavits.  <u>See</u> <u>Schaffer</u>, 842 F.3d at 594 (determining that an affiant need not "include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not" (quoting <u>Tech. Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir. 2001)); <u>Johnson v. Schneiderheinz</u>, 102 F.3d 340, 341 (8th Cir. 1996) ("[I]f an officer acts in a manner about which officers of reasonable competence could disagree, the officer should be immune from liability." (internal citations omitted)).  The affidavits also included specific facts that counseled against a probable cause determination: that certain terms used in Cronin's text messages might not refer to controlled substances; that a lab had not yet confirmed the nature of the drugs seized from the supplement store; that additional evidence from Cronin's bank and telephone service provider had not yet been obtained; that Cronin asserted that the products at issue were legal and able to be purchased online; and that Peterson only "believe[d]" that the Toyota 4Runner listed in the affidavit was Cronin's daily vehicle.  These facts do not show a material omission that negates a finding of probable cause.

The subsequent warrant and warrant extension affidavits also established probable cause to search Cronin's cellphone.  In these affidavits, Peterson mostly restated the facts included within his prior affidavits but also included the following updated facts, which further supported a finding of probable cause: that Cronin's bank had provided a copy of a $430 check from Cronin to the supplement store owner; that Cronin's telephone company records confirmed text messages and voice calls between Cronin's phone and the supplement store owner's phone; and that the product "anavar" had not yet been found.

-11-

Cronin claims that Peterson and Peters omitted the following material facts from the cellphone warrant affidavits: that the previous warrants had been served without revealing anything incriminating; that officers searched Cronin's wife's vehicle, even though it was Cronin's vehicle that was specified in the search warrant; and that a substance called "anabol" had been seized from another Lincoln officer and had tested negative for controlled substances.[5]

The inclusion of Cronin's additional details would not have negated the existence of probable cause. Although Cronin argues that Peterson omitted the results of the earlier-executed warrants, those results could be inferred plainly from the new affidavits: Peterson stated that prior warrants had been executed, resulting in the search of "several locations" including Cronin's locker, his police cruiser, and himself; that Cronin had turned over the product "anabol"; and that the product "anavar" had not yet been located—thereby implying that the warrant executions had not uncovered the suspected products. See Tech. Ordnance, 244 F.3d at 650 ("Imprecision in the affidavit may show that [the agent] was careless in drafting some of the language, but careless error does not show reckless or intentional misconduct."). The affidavits already contained facts that counseled against probable cause: that Cronin had turned over one product, "anabol," to Lincoln police; that pre-testing indicated anabol might not be a controlled substance; and that further testing was being conducted. Thus, even if the warrant execution results had been made more explicit in these affidavits, the text messages from the Ohio detective, the new corroborating information from Cronin's phone company and bank, and the affidavit's other contents were nonetheless sufficient to establish probable cause that evidence of illegal steroid possession or use would be found in Cronin's cellphone.

---

[5]The district court did not address the warrant extensions in its order granting summary judgment to the appellees. Cronin raised the issue of the extensions consistently throughout his briefing, however, including at the summary judgment stage, and thus we address his arguments.

We therefore conclude that because inclusion of the additional details would not have negated the existence of probable cause, any omissions were immaterial and Peterson and Peters were entitled to qualified immunity.

3.  Improper Search Warrant Execution Claim Against Reynolds

Finally, Cronin argues that the district court erred in granting summary judgment in favor of Reynolds on Cronin's claim that Reynolds unlawfully executed the vehicle search warrant.  Cronin contends that Reynolds violated his Fourth Amendment rights by searching Cronin's wife's vehicle, a Ford Escape, which was not the Toyota 4Runner listed in the warrant but which Cronin drove to work daily. We accordingly address whether Reynolds had independent probable cause to conduct a warrantless search of Cronin's vehicle under the automobile exception.

Although a warrantless search usually constitutes a *per se* Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so.  Chambers v. Maroney, 399 U.S. 42, 51–52 (1970).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)).  Because "[p]robable cause is a practical and common-sensical standard," "an officer may draw inferences based on his own experience" to determine whether probable cause exists. Id. (internal quotation marks and citations omitted).

Based on the Ohio detective's allegations that Cronin had purchased illegal steroids for a coworker, Reynolds developed probable cause to believe that the vehicle that Cronin drove to work daily would contain evidence of illegal steroids. When Reynolds failed to uncover the supplement "anavar" in Cronin's home, he had

all the more reason to believe that the sought-after substances would instead be in Cronin's vehicle. Reynolds inferred that the Ford Escape was the vehicle that would contain such evidence of illegal substances when Sergeant Destry Jaeger, who knew Cronin personally, identified it in the police department's parking lot as the vehicle that Cronin drove to work daily.

Although Reynolds may very well have not been the exemplar of a careful officer, his search of the Ford Escape was authorized under the automobile exception to the warrant requirement, and he was thus entitled to qualified immunity on Cronin's unlawful warrant-execution claim.

The district court's order is affirmed.

_____