# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3029

_____

Young America's Foundation, a Tennessee nonprofit corporation; Students for a Conservative Voice, a Registered Student Organization at the University of Minnesota; Ben Shapiro

*Plaintiffs - Appellants*

v.

Eric W. Kaler, President Emeritus of University of Minnesota, in his individual capacity; Michael Berthelsen, Vice President of University Services of University of Minnesota, in his official and individual capacities; Matthew Clark, Chief of Police of University of Minnesota, in his official and individual capacities; Troy Buhta, Lieutenant of University of Minnesota Police Department, in his official and individual capacities; Erik Dussault, Assistant Director of Student Unions & Activities of University of Minnesota, in his official and individual capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 11, 2021
Filed: October 4, 2021

_____

Before SMITH, Chief Judge, SHEPHERD and GRASZ, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Students for a Conservative Voice (SCV) brought Ben Shapiro to speak at the University of Minnesota Twin Cities Campus at an event funded by Young America's Foundation (YAF). University of Minnesota (University) officials rejected various proposed venues for the event, citing security concerns. The officials ultimately approved a smaller, more remote venue than what SCV had requested. SCV, YAF, and Shapiro (Appellants) brought claims under 42 U.S.C. § 1983 against the officials, alleging that the University's then-existing events policy was unconstitutional facially and as applied to them under the First and Fourteenth Amendments. Because we find that SCV's facial challenges and requests for injunctive relief are now moot and that Appellants lack standing to maintain their as-applied claim, we vacate the district court's orders with respect to those claims and remand with instructions to dismiss without prejudice.

I.

In 2017, SCV and Collegians for a Constructive Tomorrow (CFACT), student organizations at the University, hosted an event featuring conservative speaker Lauren Southern on the University's Twin Cities Campus. Prior to the event, SCV became aware that a group of students planned to protest the event. In response, SCV contacted the University of Minnesota Police Department (UMPD) and requested additional security. Upon learning of these security concerns, Erik Dussault, Assistant Director of Student Unions & Activities, scheduled a meeting between the student organizations, UMPD, and himself to discuss security for the event. At this meeting, CFACT mentioned that it, along with SCV, intended to bring Shapiro to campus the following semester and expressed that similar safety concerns would likely be present.[1]

_____

[1]As described by the district court, Shapiro is:

an "American political commentator, nationally syndicated columnist, author, radio talk show host, and attorney." He holds a [B]achelor's degree in political science from the University of California – Los

-2-

Dussault suggested that the students follow the University's "Large Scale Event Process" (LSEP) in planning that event. On its face, this policy is a mandatory approval process for "large scale events,"[2] which requires student organizations to submit a proposal to a committee of administrators and students which then determines whether the campus can logistically support the event. The parties dispute whether the LSEP was in fact mandatory, and the record is unclear as to whether the LSEP committee even existed. It is undisputed that SCV never submitted a proposal, and the record indicates that no party followed the process in planning for the Shapiro event. Since the commencement of this litigation, the University has replaced the LSEP with a more defined "Major Events" policy, which applies to all individuals regardless of their connection to the University.

The Lauren Southern event was met with a 250-person protest, which resulted in two arrests, a campus curfew, and the use of chemical spray. However, the event itself progressed as planned, unaffected by the disruption. That same evening, SCV

---

Angeles, and a [J]uris [D]octorate from Harvard Law School. He is the prior editor-in-chief for the Daily Wire, and the host of a podcast and radio show. He also writes a syndicated column for Creators Syndicate, and works with YAF to schedule speaking opportunities on college campuses around the country. While he does not currently practice law, Shapiro is a licensed attorney in California.

R. Doc. 94, at 3-4 (citations omitted).

[2]The LSEP defines "large scale events" as:

Student group sponsored events taking place in a large campus venue or outdoor space that will draw a significant amount of the campus population, a large off-campus crowd, or represents a significant security concern (i.e.[,] public figure, celebrity, etc.). Events may include, but are not limited to[:] concerts, lectures, public appearances, performances[,] and rallies.

R. Doc. 1-1, at 2.

submitted a reservation request for the Mayo Auditorium for a "Ben Shapiro Speech" on February 26, 2018, stating:

> We will be holding the event in Mayo Auditorium. We understand there is a fee and insurance cost associated with it. That is not an issue. DO NOT relocate this event, and DO let us know the additional work we will be required to do ahead of time. The event will likely require security.

R. Doc. 17-1, at 1. SCV initially estimated attendance for the Shapiro event to be about 400 people and requested the Mayo Auditorium because the venue held 455 people and was centrally located on the East Bank portion of the University's campus.[3] This request was forwarded to the University President, Eric Kaler, who then sent an email to his chief of staff stating, "So have they actually invited Ben Shapiro? I do not want this in the middle of campus - West Bank is a better location." R. Doc. 51-2, at 2. Kaler later testified that he was concerned about hosting the event in the Mayo Auditorium because it is in the middle of the medical school and near the campus's transit train's route. He believed that the event would be better located farther from the center of campus "so that if there was a disruption it would have minimal effect on the thousands of people who come to the [U]niversity for reasons besides protesting." R. Doc. 73-8, at 28-29.

---

[3]The University's Twin Cities campus is divided into three portions. East Bank and West Bank are located in Minneapolis on either side of the Mississippi River. The other portion of the campus is located in St. Paul. East Bank is the central campus and contains 11 of the University's 13 residence halls, whereas West Bank and St. Paul each contain only 1 residence hall. It takes approximately 15 minutes by car to get from West Bank to St. Paul. The campus also maintains a bus service that offers free transportation to students between the portions of campus. It takes the bus service 5 minutes to go between West Bank and East Bank; 15 minutes to go between East Bank and St. Paul; and 20 minutes to go between West Bank and St. Paul.

Despite its reservation request for the Mayo Auditorium, SCV continued to look for larger venues. SCV had difficulty finding a venue because the University had not finalized its spring semester class schedule. The student organization inquired as to the availability of the Tedd Mann Concert Hall and the Northrop Auditorium, venues located in West Bank with capacities of 1,178 and 2,692 people, respectively. The administrations of these venues declined to hold the event, and Dussault later clarified that the decisions were based on the unavailability of the venues on the event date. SCV also submitted a request to host the event at Willey Hall, a West Bank location with a 1,058-person capacity; the administration of the venue set this request to "tentative" because the Mayo Auditorium was still being held for the event.

On December 19, 2017, Lieutenant Troy Buhta, representing the UMPD, and SCV conducted a "walkthrough" of the Mayo Auditorium to perform a security assessment. Following the walkthrough, Buhta concluded that security concerns rendered the Mayo Auditorium unsuitable for the event, namely the venue's direct connection to the University's hospital and the burden of having to determine whether an individual was a security threat or merely associated with the hospital. The following day, Dussault recommended Ferguson Hall, located in West Bank with a 150-person capacity, and the North Start Ballroom, located in St. Paul with a 555-person capacity. SCV later stated that it would have never agreed to Ferguson Hall based on its limited capacity. Accordingly, Dussault sent an email to SCV and Buhta stating: "Sounds like [i]t will be a decision between the North Star Ballroom or Willey Hall then." R. Doc. 65-4, at 10. Buhta replied, "Willey [Hall] is not going to be a good option due to access from the skyway." R. Doc. 65-4, at 11. In addition, Buhta recommended the Continuing Education and Conference Center, located in St. Paul with a 392-person capacity. Based on this information, SCV responded, "It looks like St. Paul will be our best option," and requested reservations for both the North Star Ballroom and the Continuing Education and Conference Center. R. Doc. 65-4, at 46. Notably, later that day, Matt Clark, the University's Chief of Police, sent an email to Ken Gay, the Director of the Continuing Education and Conference

Center, stating: "The admin has asked that we try to move this visit to the St. Paul campus. It's going to be a security issue with past lectures at other universities." R. Doc. 65-4, at 31. The next day, he sent another email to Gay stating that "the crowd size need[ed] to be limited to 500" and that he expected there to be protestors present. R. Doc. 65-4, at 30.

SCV later decided to eliminate the Continuing Education and Student Center from its consideration based on its associated event costs and smaller size. After a walkthrough of the North Star Ballroom, SCV reserved the venue for its event. SCV subsequently met with the venue's event manager to discuss seating configurations; SCV selected the 400-seat configuration because any additional seats would have had an obstructed view. A few weeks later, SCV began selling tickets and sold out within hours. Dussault informed SCV that 49 seats could be added to the North Star Ballroom, though the attendees would have partially obstructed views, and SCV agreed to the expansion.

In late January, SCV, in coordination with YAF, began a "press push" to place public pressure on the University to provide a larger venue. As part of this campaign, YAF published a blog post discussing the event planning process and accusing the University of viewpoint discrimination. On February 12, 2018, a member of the University's Board of Regents emailed the University and expressed concerns about the event planning process. In the member's opinion, the University's messaging regarding the venue changes was inconsistent and Willey Hall was easier to secure than the North Star Ballroom. This email was forwarded to Clark as well as Michael Berthelsen, the Vice President of University Services. Clark responded:

> We are already past capacity for this event considering the number of officers on UMPD. Adding additional seats and guarding a growing protest crowd creates greater safety risk and concern. Changing the venue to Willey [Hall] would require more personnel to guard skyway access from other buildings and tunnels. As we discussed, [UMPD] is not trained or prepared to handle these events. At best, they [are]

-6-

limited to static/non-confrontational locations. If this grows to a larger protest and counter protest crowd, we need to cancel the event for safety reason[s], or request many more officers from other agencies. The location of this event was established and agreed upon (by the student group) based on the limited personnel within [UMPD].

R. Doc. 65-4, at 110.

On February 16, 2018, the Vice President of SCV submitted another request for Willey Hall, but the request was denied because SCV had already booked the North Star Ballroom. SCV subsequently issued a "Statement on Ben Shapiro's Speech at the University of Minnesota," alleging in part that "[t]he University [was] unwilling to risk protestors shutting roads, blocking trains, or forcing hospitals into lockdowns so that students would have the opportunity to hear Ben Shapiro speak." R. Doc. 65-4, at 100. On February 19, 2018, Matt Kramer, the University's Vice President of University Relations emailed Dussault inquiring as to the amount of people on the event's wait list. Maggie Towle, the University's Vice Provost, who was included on the email, interjected, stating:

I have concerns with this request as we normally wouldn't engage with any student group [regarding] their wait list. The event will be live streamed and seems like the alternative for those that want to see the program. Unless the [University] plans to move this to a larger venue (which I do not recommend) I see no purpose in asking about the wait list.

R. Doc. 65-4, at 114. Berthelsen likewise responded, saying, "We are not moving the event." R. Doc. 65-4, at 114. Then the University conducted a press conference where Kaler explained that the University held no bias toward conservative views and that decisions were made for safety reasons. Kaler stated, "We are . . . mindful of the fact that [Shapiro] is a controversial speaker and that at several places where he's spoken, protest[ors] have objected, and we intend to ensure the event is safe for all who attend." R. Doc. 73-15, at 22.

Prior to the event, UMPD conducted a security assessment of the event. Under the heading "Scenarios of Concern," the report stated in part:

> There is no credible information indicating a threat to the venue, speaker, or guests. However, activist groups like ANTIFA & Black Lives Matter and individuals who were unable to obtain tickets are likely to protest outside the St. Paul Student Center before and during the event. There is also a potential for violence between opposing groups, as seen at the Lauren Southern event in October, where disturbances were disrupted via chemical spray.

R. Doc. 73-16, at 47. The report further identified a plan to protest the event promoted by Students for a Democratic Society, another student organization at the University.[4] Additionally, UMPD compiled a detailed "incident action plan" for the event.

The Shapiro event occurred on February 26, 2018, in the North Star Ballroom. The venue was sold out, with approximately 450 people in attendance. Those who were unable to attend the event were able to livestream Shapiro's speech. About 40 people protested outside the event. The event was executed without any major disruptions, and Shapiro was able to share his views and field questions from the audience. The University incurred approximately $15,000 in security and incidental expenses, including the cost of the 104 to 114 officers available at the venue and the concrete and steel barricades used to limit access to two streets near the event. None of these costs was passed on to SCV, YAF, or Shapiro.

Appellants filed suit against Kaler, Berthelsen, Clark, Buhta, and Dussault (Appellees) in their official and individual capacities seeking both injunctive relief and damages. Appellants alleged violations of their First and Fourteenth Amendment rights under 42 U.S.C. § 1983. Specifically, Appellants alleged that the

---

[4]SCV alleges that Students for a Democratic Society is the group who helped plan and execute the protests at the Lauren Southern event.

LSEP was unconstitutional on its face and as it was applied to Appellants under the First Amendment's guarantee of free speech. Appellants also alleged that the LSEP violated the Fourteenth Amendment's Due Process and Equal Protection Clauses due to the policy's vague language and Appellees' practice of using the LSEP as a justification for suppressing conservative viewpoints, respectively.

Appellees moved to dismiss the complaint in its entirety. The district court found that YAF and Shapiro lacked standing to seek injunctive relief on any claim. The district court also dismissed Kaler from the suit, finding that there were insufficient facts to tie him to the decision-making process. The district court further found that both facial challenges under the First Amendment and Due Process Clause of the Fourteenth Amendment failed under the relevant standards and dismissed the claims. Finally, the district court found that Appellants' equal protection claim was barred by qualified immunity and accordingly dismissed the claim. After discovery, Kaler was added back to the suit.

The parties subsequently filed cross-motions for summary judgment on Appellants' only remaining claim: their First Amendment as-applied claim. The district court found that qualified immunity barred Appellants' claims for damages against Appellees in their individual capacities. The district court further found that SCV, as the only party with standing to seek injunctive relief, had failed to show that Appellees in their official capacities had maintained an unconstitutional custom and that SCV accordingly was not entitled to injunctive relief. The district court granted Appellees' motion for summary judgment and denied Appellants' motion.

Appellants appeal the district court's grant of summary judgment with respect to their First Amendment as-applied claim against Appellees in their individual capacities. As the only party with standing to seek injunctive relief, SCV also appeals the dismissal of the First Amendment facial claim and the Fourteenth Amendment due process claim and the district court's grant of summary judgment with respect to its First Amendment as-applied claim against Appellees in their

official capacity. Appellants do not challenge the district court's findings with respect to YAF's and Shapiro's lack of standing to seek injunctive relief nor the district court's dismissal of Appellants' equal protection claim.

## II.

Appellees argue that SCV's facial challenges to the LSEP under the First and Fourteenth Amendments are moot because the University replaced the LSEP with a new "Major Events" policy. "Article III mootness arises from the Constitution's case and controversy requirement: 'Article III of the United States Constitution limits the jurisdiction of the federal courts to actual, ongoing cases and controversies.'" Ali v. Cangemi, 419 F.3d 722, 723 (8th Cir. 2005) (en banc) (citation omitted); see also U.S. Const. art. III, § 2, cl. 1. A case is considered moot "[w]hen, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief.'" Id. (second alteration in original) (citation omitted). "When a law," or in this case, a university policy, "has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot unless the problems are 'capable of repetition yet evad[ing] review.'" Phelps-Roper v. City of Manchester, 697 F.3d 678, 687 (8th Cir. 2012) (alteration in original) (citation omitted). However, a policy is not "capable of repetition yet evading review" merely because the governing body has the power to reenact the policy after the lawsuit is dismissed. See Teague v. Cooper, 720 F.3d 973, 977 (8th Cir. 2013). Instead, "[t]he exceptions . . . are rare and typically involve situations where it is virtually certain that the repealed [policy] will be reenacted." Id. (citation omitted).

Here, we find that this is not one of those rare situations. The new "Major Events" policy was enacted at the administrative level and became effective on March 27, 2020. The policy governs "major events" across the Twin Cities Campus regardless of whether the events are hosted by students or other individuals. The

University did not merely repackage the LSEP under a new banner but instead amended the substance of the policy seemingly to address SCV's concerns. SCV argues that the LSEP contained vague terms which empower decisionmakers with impermissibly broad discretion. See, e.g., Appellants Br. 29 ("The terms 'significant amount of the campus population,' 'large off-campus crowd,' and 'significant security concern' are undefined in the [LSEP]."). Instead, the "Major Events" policy contains more defined terms and standards. For example, it defines a "major event," in part, as an event "with an anticipated audience size of at least two hundred involving an outside speaker." Additionally, instead of generally referencing "significant security concern[s]," R. Doc. 1-1, at 2, the new policy states that the University will deny an event proposal on the basis of safety concerns only if "the event poses a clear and present risk to public health or safety and the University does not have sufficient resources to adequately address such risk." Finally, the new policy specifically responds to SCV's concerns that such a policy could be used to exercise viewpoint discrimination through a "heckler's veto"[5]: "The potential reaction to the event will not be used as a basis for denying a proposed event."

Further, SCV has not shown that it is "virtually certain" that the LSEP will be reenacted. See Teague, 720 F.3d at 977 (citation omitted). Because the new "Major Events" policy is more detailed and pertains to the entirety of the University's Twin Cities Campus, it is unlikely that the less defined LSEP, which was enacted only by the University's Student Unions & Activities Department, will be reenacted. We pass no judgment on whether this new "Major Events" policy passes constitutional muster; we note only that the new policy is distinct from the LSEP such that providing declaratory or injunctive relief with respect to the LSEP would have no effect on the "Major Events" policy. See Ali, 419 F.3d at 723; Phelps-Roper, 697 F.3d at 687. Accordingly, we find that SCV's facial challenges under the First and Fourteenth Amendments against Appellees in their official capacity are moot.

---

[5]"The 'heckler's veto' involves situations in which the government attempts to ban protected speech because it might provoke a violent response." Roe v. Crawford, 514 F.3d 789, 796 n.3 (8th Cir. 2008).

-11-

Appellants allege that the Appellees unconstitutionally applied the LSEP to the Shapiro event-planning process. While no party raised the issue, we find it necessary to determine whether Appellants have standing to maintain their as-applied challenge. See Bernbeck v. Gale, 829 F.3d 643, 646 (8th Cir. 2016) ("Standing, although not raised by the parties on this appeal, is a 'jurisdictional prerequisite' and thus 'a threshold issue that we are obligated to scrutinize,' sua sponte if need be." (citations omitted)). To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). "Because these requirements are 'an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." [6] Bernbeck, 829 F.3d at 646 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). Accordingly, the plaintiff may rely on "general factual allegations of injury resulting from the defendant's conduct" at the pleading stage, but at the summary judgment stage the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" to meet its burden.[7] Lujan, 504 U.S. at 561 (citation

---

[6]The dissent asserts that the district court erred in dismissing on summary judgment the Appellants' claim that Appellees unconstitutionally applied the LSEP to them in the Shapiro event-planning process. But in considering the Appellants' standing to assert this claim, the dissent focuses on standing at the pleading stage, not at the summary judgment stage. Our discussion of Appellants' complaint is for the purposes of determining the contours of their First Amendment claim, not to consider whether the allegations in the complaint confer standing on Appellants. Because we must determine whether Appellants have standing at each stage of litigation, our analysis is properly focused on the evidence Appellants must have produced at the summary judgment stage to demonstrate that they have standing.

[7]In discussing what a defendant must allege to satisfy its pleading burden for standing, the dissent relies on the statement that "we presume that general allegations

omitted); Cronin v. Peterson, 982 F.3d 1187, 1193 (8th Cir. 2020) ("Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (citation omitted)).

To establish Article III causation in an as-applied challenge, "a plaintiff must show that its injury is 'fairly traceable' to a challenged statutory provision," or as in this case, a university policy. See Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 735 (8th Cir. 2011) (citation omitted). Accordingly, a plaintiff does not have standing to challenge a policy that was not applied to it. See Advantage Media, L.L.C. v. City of Eden Prairie, 456 F.3d 793, 799-801 (8th Cir. 2006) (holding that plaintiff lacked standing to challenge portions of a severable municipal code that were not applied in the denial of plaintiff's permit application); cf. Phelps-Roper v. Ricketts, 867 F.3d 883, 896 (8th Cir. 2017) ("[A plaintiff] generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been . . . unconstitutionally *applied* to [it]." (second alteration in original) (quoting McCullen v. Coakley, 573 U.S. 464, 485 n.4 (2014))).

Here, Appellants specifically alleged in their complaint that Appellees applied the LSEP in an unconstitutional manner by exercising viewpoint discrimination in

---

embrace those specific facts that are necessary to support [a contested] claim." See infra, at ___ (quoting Const. Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir. 2011)). However, our Court has recently expressed doubt about the validity of this rule post- Iqbal and Twombly. See Hawse v. Page, 7 F.4th 685, 689 n.6 (8th Cir. 2021) ("In cases decided before Iqbal and Twombly, a court presented with an issue of Article III standing would 'presume[ ] that general allegations embrace those specific facts that are necessary to support the claim.' Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990). But the Court in National Wildlife Federation expressly drew that formulation from the permissive pleading regime of Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which was retired by Twombly. 550 U.S. at 561-63. Some post-Twombly decisions, like the dissent in this case, quote the phrase without identifying its origin. We see no reason why an analytical approach taken specifically from an abrogated decision would survive the abrogation." (alteration in original)).

restricting the Shapiro event to the St. Paul campus.[8] Now, at the summary judgment stage, Appellants have not put forth sufficient evidence for a reasonable jury to find that Appellees in fact applied the LSEP to them. See Anderson v. Liberty Lobby,

[8]For example, in their Second Amended Verified Complaint, Appellants alleged:

181. In practice, the [LSEP] punishes disfavored speech because it allows University officials to move SCV to a smaller, more remote location based on the alleged []controversial nature of the event and a completely speculative number of protestors that may choose to attend and protest—or blockade—SCV's event.

182. In practice, Defendants' [LSEP] was applied against Plaintiffs' expressive events without the narrow, objective, or definite standards that are constitutionally required to limit the discretion of [University] officials.

183. Defendants' [LSEP] was applied against Plaintiffs' expressive events without requiring [University] officials to provide written justification for their decision to impose restrictions on student speech.

184. Defendants' [LSEP] was applied against Plaintiffs' expressive events without an appeal process for students to utilize when restrictions were imposed on their event and Plaintiffs were denied the opportunity to appeal the restrictions imposed on their event.

. . . .

187. Defendants' application of the [LSEP] to Plaintiffs' events was neither a reasonable nor valid time, place, and manner restriction on speech because it was not content-neutral, it was not narrowly tailored to serve a significant government interest, and it did not leave open ample alternative channels of communication.

R. Doc. 58, at 28-30.

Inc., 477 U.S. 242, 248 (1986). The record reflects that Appellees' decisions were independent of the LSEP and made within the scope of each Appellees' position at the University, but Appellants' complaint presents no First Amendment challenge to Appellees' actions apart from Appellees' application of the LSEP. See Singleton v. Ark. Hous. Auths. Prop., 934 F.3d 830, 837 (8th Cir. 2019) ("[Although] the pleading requirements under the Federal Rules [of Civil Procedure] are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." (alterations in original) (citation omitted)).[9]

---

[9]In concluding the "Allegations of Law" in their Second Amended Verified Complaint, Appellants state: "Pursuant to 42 U.S.C. §§ 1983 and 1988, SCV is entitled to a declaration that Defendants violated Plaintiffs' First Amendment rights through their assessment of restrictions on Plaintiffs *pursuant to the* [*LSEP*]." R. Doc. 58, at 31 (emphasis added). There are allegations in Appellants' complaint that *could* be read to include a general First Amendment challenge when the allegations are read in a vacuum. For example:

> 178. Defendants violated Plaintiffs' First Amendment rights by refusing to allow SCV to use Willey Hall because Defendants determined, with their unbridled discretion, that the Shapiro Event involved "controversial activity."

> 179. Defendants engaged in content- and viewpoint-based discrimination by examining whether Plaintiffs' speech was "controversial" and how listeners might react to the speech.

R. Doc. 58, at 28. However, "[t]he complaint 'should be read as a whole,'" Warmington v. Bd. of Regents, 998 F.3d 789, 795 (8th Cir. 2021) (citation omitted), and in doing so here, it is clear that these paragraphs refer to the standards articulated in Appellants' as-applied challenge to the LSEP in the prior paragraph:

> 177. Defendants' [LSEP] and their practice of refusing to allow student organizations to use certain venues on campus if Defendants consider the event to be "controversial" is based on listeners' reactions and violates the First Amendment *as-applied* because they grant

As a general matter, both parties agree that despite the LSEP's mandatory language, it was not mandatory in practice. See Appellants Br. 17 (arguing that "the University has never required any other student groups hosting events on campus to comply with the [LSEP]"); Appellees Br. 8-9 (stating that, while the process is not mandatory, "[s]everal student groups follow the LSEP each year"). Further, the record is unclear as to whether the LSEP was followed for *any* events:

> [T]he enforcement body, the Large Scale Events Committee does not even exist and the University has not required any other groups to follow the [LSEP]. Because the Committee does not exist, [Dussault] acknowledged that he does not know what the university would do with a request: "Well, I don't currently know who we would give it to . . . . I would at least give it to my supervisor, Denny, who would then *potentially* bring it forward to *whoever* from university services would consider it." Asked whether he has ever handled a proposal in this manner under the [LSEP], Dussault said, "No."

> [University] officials unbridled discretion to discriminate against speech based on its content or viewpoint.

R. Doc. 58, at 28 (emphasis added). The dissent suggests that, when read as a whole, the complaint clearly encompasses both the LSEP and "other conduct and 'practices' beyond the LSEP" as part of Appellants' First Amendment claim. But this reading of the complaint ignores that the "other conduct" and "practices" are explicitly tied to implementation and execution of the LSEP, particularly where the Appellants multiple times refer to these "practices" as "associated" with the Speech Suppression Policy, which is made up of the LSEP. Where the challenged practices are associated with the LSEP and thus dependent on the implementation of the LSEP, they cannot form a basis for an independent First Amendment claim. As the plaintiffs in this case, Appellants are the masters of their complaint. See Winfrey v. City of Forrest City, 882 F.3d 757, 758 (8th Cir. 2018). When it became clear that their alleged injury was not rooted in Appellees' application of the LSEP, Appellants had ample opportunity to amend their complaint accordingly. We will not now on review of a summary judgment decision read in a new claim in order to confer standing to Appellants. See Singleton, 934 F.3d at 837.

-16-

Appellants Br. 13 (fourth alteration in original) (citations omitted).

Even assuming the LSEP was occasionally used at the University, there is no evidence in the record that Appellees in fact applied the LSEP to SCV's event. Dussault initially "suggested" that SCV use the LSEP. R. Doc. 73-6, at 99-100. But there is no record evidence showing that Appellees required SCV to follow the LSEP or that SCV ever in fact participated in the LSEP, see, e.g., R. Doc. 73-5, at 100, much less that an LSEP committee ever met to discuss the event. If the record indicated that Appellees merely deviated from the LSEP, we might find that Appellants' have standing to bring their as-applied challenge to determine whether Appellees imposed some "unique scrutiny" upon SCV in planning the Shaprio event, cf., e.g., Gerlich v. Leath, 861 F.3d 697, 704-07 (8th Cir. 2017) (finding that university officials applied university policy in a discriminatory manner when reviewing plaintiffs' trademark application in part by requiring plaintiffs to obtain additional approval not required by the general policy), but the record does not include an indicia of evidence that the LSEP impacted Appellees' actions. The record shows that Appellees' actions were independent of the LSEP, premised on concerns related to each Appellee's University role. In short, Appellants have failed to establish causation at the summary judgment stage, i.e., they have failed to establish that the alleged injury—the violation of their First Amendment right to free speech—is "fairly traceable" to Appellees' alleged application of the LSEP. See Spokeo, Inc., 136 S. Ct. at 1547. Accordingly, we find that Appellants do not have standing to maintain their as-applied challenge because they have not shown that the LSEP was in fact applied to them.[10]

---

[10]Our findings are in agreement with the district court, which noted:

[T]here is no record evidence that SCV actually participated in the LSEP process, or was ever actually required to follow the LSEP's requirements. SCV never filled out any LSEP forms related to the Shapiro event—beyond a venue reservation request—and did not prepare a LSEP proposal for either the Lauren Southern or Shapiro events. Moreover, there is no evidence that an LSEP committee ever

-17-

IV.

Accordingly, because we find that SCV's claims for injunctive relief are moot and that Appellants lack standing to maintain their as-applied claim, we vacate the district court's order of dismissal and grant of summary judgment as it relates to those claims and remand with instructions to dismiss the claims without prejudice.[11]

GRASZ, Circuit Judge, concurring in part and dissenting in part.

I agree the students' facial challenge to the University's Large Scale Event Process/Policy is moot, and concur in part II of the court's opinion. I respectfully disagree, however, with the court's conclusion in part III that the students' complaint fails, on its face, to clear the rather low bar of alleging facts sufficient to establish Article III standing for the students' remaining claims. And because I believe the facts viewed in the light most favorable to the students set forth a viable First Amendment claim, I would reverse the district court's summary judgment order.

## I. Standing

In assessing whether the students' complaint establishes standing for their remaining First Amendment claims, the court rightly observes that it must be "read

---

met to discuss the event, much less that a committee ever approved or denied Shapiro's visit. In contrast, SCV did precisely what student groups typically do when planning events that raise safety concerns— they work with [the University] and the UMPD to ensure the event is hosted safely.

R. Doc. 94, at 62; see also R. Doc. 94, at 65. We pass no judgment on the constitutionality of Appellees' actions, only that Appellants have failed to establish standing to challenge those actions through its as-applied challenge of the LSEP.

[11]Accordingly, we also vacate the district court's denial of Appellants' motion for summary judgment.

-18-

as a whole." *Ante*, at 15 n.9. But reading the complaint "as a whole" does not negate our duty to read the complaint according to the applicable standard for determining standing at the pleading stage.

As the court acknowledges, "There are allegations in the Appellants' complaint that *could* be read to include a general First Amendment challenge[.]" *Id.* Indeed, neither the district court nor any of the many defendants raised, discussed, or found the standing issue identified by the court. True, our court has an independent responsibility to ensure Article III standing. *See Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016). But that does not mean we may rewrite the complaint's terms or construe its allegations in a manner that divests the court of jurisdiction where an alternative construction is both readily available and more consistent with its language.

Precedent dictates that we must "construe the complaint in favor of the complaining party." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009).[12] This means viewing the complaint's allegations in the light most favorable to the plaintiffs. *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1178 (8th Cir. 2021). When viewing the complaint, we also make all reasonable inferences in favor of the plaintiffs. *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 715–16 (8th Cir. 2017). All this is done in a general framework which allows a plaintiff to satisfy its pleading burden for Article III standing with "general factual allegations." *Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020) (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013)). This is because "we presume that

---

[12]The court suggests I am applying the wrong standard because the case is no longer at the pleading stage but has progressed to the summary judgment stage. *Ante*, at 12 n.6. But this is not a case where the court is determining the plaintiff has failed to support its allegations with competent evidence. Instead, the court is determining the plaintiffs' evidence does not fit within the confines of the allegations. In making that determination, I see no reason why we would not apply the pleading standard to determine the scope of the allegations in the complaint.

-19-

general allegations embrace those specific facts that are necessary to support [a contested] claim." *Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 550, 561 (1992)).[13]

In the context of our assessment of Article III standing, reading the students' complaint "as a whole" is part and parcel of our duty to construe the complaint in favor of the complaining party. Here, two key paragraphs that must be read in conjunction with the remainder of the complaint are paragraphs 2 and 3. Paragraph 2 states, "This case arises from the *policies **and practices*** of [the] University of Minnesota . . . and public officials employed by the University that restrict the expressive rights of students and student organizations." R. Doc. 58, at 2 (emphasis added). Paragraph 3 states, "UM has a *Large Scale Events Policy **and practice*** that it uses to censor, restrict, and inhibit unpopular speech, thus unconstitutionally infringing upon students' First Amendment and Fourteenth Amendment rights (***the "Speech Suppression Policy"***)." *Id*. (emphasis added).

So, by its own terms, the complaint defines "Speech Suppression Policy" as referring to *both* the Large Scale Events Policy (LSEP) and the "practice" of the defendants.

Despite this, the court takes a different path, cabining the students' "as-applied" First Amendment challenge exclusively to the LSEP.[14] This approach

---

[13]The court doubts the validity of this rule post-*Iqbal* and *Twombly*. *Ante*, at 12-13 n.7. But we have applied the rule post-*Twombly*, *see Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018), and so until the Supreme Court or the en banc court decides otherwise, it is still the law of the circuit. *See United States v. Hellems*, 866 F.3d 856, 863 n.3 (8th Cir. 2017) (recognizing a panel is bound by Eighth Circuit precedent).

[14]Admittedly, the students' complaint had confusing labeling. In paragraph 55 of the complaint, the students say that they have attached, as Exhibit 1, "A copy

overlooks that the complaint defines the "Speech Suppression Policy" to include other conduct and "practices" beyond the LSEP.[15] The court also fails to actually read the complaint as a whole. Indeed, following paragraphs 2 and 3, quoted above, numerous additional paragraphs of the complaint present general factual allegations sufficient to satisfy the students' burden of showing injury fairly traceable to the defendants' conduct *outside of, or in addition to, the LSEP*. Even if one could somehow equate the Speech Suppression Policy with the LSEP, I count no less than six paragraphs of the complaint that reference the Speech Suppression Policy which also expressly refer to *practices* beyond the LSEP that allegedly infringe upon the students' First Amendment rights. R. Doc. 58, ¶¶ 18, 176, 177, 180, 197, 199.[16]

---

of the Speech Suppression Policy." Exhibit 1, however, is actually a copy of the LSEP. Read in isolation, or under a less forgiving standard of review, I might agree this mistake could doom the students' claim. However, we must read the complaint as a whole and we must consider its allegations in the light most favorable to the students. *Metro. St. Louis*, 569 F.3d at 834.

[15]In at least seven places the court's opinion substitutes "[LSEP]" in place of "Speech Suppression Policy," when analyzing the complaint. *Ante*, at 13–14 n.8, 15 n.9.

[16]These allegations include:

18. Defendants' application of the Speech Suppression Policy *and practices* have deprived and will continue to deprive Plaintiffs of their paramount rights and guarantees under the United States Constitution.

176. Defendants' Speech Suppression Policy *and their practice* of refusing to allow student organizations to use certain venues on campus if Defendants believe the event is "controversial" violates the First Amendment as-applied because it is a prior restraint on speech in areas of campus that are traditional or designated public fora for UM students.

177. Defendants' Speech Suppression Policy *and their practice* of refusing to allow student organizations to use certain venues on campus

And many other paragraphs of the complaint reference actions taken beyond the LSEP. *Id.* ¶¶ 94–97, 111–12, 161–62, 172–75, 178–79.[17]

if Defendants consider the event to be "controversial" is based on listeners' reactions and violates the First Amendment as-applied because they grant UM officials unbridled discretion to discriminate against speech based on its content or viewpoint.

180. Defendants' Speech Suppression Policy *and associated practice* of refusing to allow certain student organizations to use certain venues for "controversial" events constituted an unconstitutional "time," "place," and "manner" restriction that violated Plaintiffs' right to freedom of speech and expression.

197. Defendants' Speech Suppression Policy *and associated practice* chill, deter, and restrict Plaintiffs from freely expressing their beliefs.

199. Defendants' Speech Suppression Policy *and associated practice* violate Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

R. Doc. 58, at 4, 27–28, 31 (emphasis added).

[17]These allegations include:

94. However, before SCV even had the opportunity to choose its preferred venue, Defendant Kaler denied them the opportunity to hold the Shapiro event in the largest and most central portion of the Minneapolis campus.

95. On October 26, 2017, Defendant Kaler replied to an email referencing a visit by Shapiro as follows: "So have they actually invited Ben Shapiro? I do not want this in the middle of campus – West Bank is a better location." A true and correct copy of the email is attached hereto as Exhibit 2.

96. Through this directive, Kaler forbid Plaintiffs from hosting the Shapiro event in the East Bank of the Minneapolis campus. The East

-22-

Bank is the heart of the Twin Cities campus and where many of the major events on campus are held because it contains many of the largest and most accessible campus venues.

97. Defendant Kaler made this decision (1) more than four months prior to the date of the Shapiro event, (2) without any information relating to security concerns about the event, and (3) even though numerous speaking events of similar or larger size are held on the East Bank of campus every year.

111. On December 21, 2017, Defendant Clark sent an e-mail to Ken Gray, the Director of the University's Continuing Education and Conference Center, stating, "The admin has asked that we try to move this visit to the St. Paul campus. It's going to be a security issue with past lectures at other universities."

112. Defendant Clark also communicated to Defendant Buhta that the Shapiro event was to be moved to the St. Paul campus, per "the admin."

161. The University unreasonably forced SCV to hold their event on the St. Paul campus even though numerous other speakers raising similar, or even greater security concerns, were welcomed to speak at the Minneapolis campus.

162. As a result of Defendants' actions, Plaintiffs were unable to deliver their message to hundreds of students that wanted to attend the event and those students were deprived the opportunity to attend the Shapiro lecture and to participate in an important dialogue on matters of public concern.

172. Each of the venues chosen, including Willey Hall, is a public forum for speech and expressive activities by students enrolled at the University.

173. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint

In my view, the court's failure to acknowledge the complaint's broad definition of "Speech Suppression Policy" and also the complaint's repeated and express references to the defendants' practices outside the LSEP, derailed the court's Article III analysis. The students did not limit their "as-applied"[18] claims solely to

discrimination in the public forums for student speech and expression on the campus of a public university.

174. A public university's ability to restrict speech—particularly student speech—in a public forum is limited.

175. Moreover, under the First Amendment's Free Speech Clause, and regardless of the type of forum, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

178. Defendants violated Plaintiffs' First Amendment rights by refusing to allow SCV to use Willey Hall because Defendants determined, with their unbridled discretion, that the Shapiro Event involved "controversial activity."

179. Defendants engaged in content- and viewpoint-based discrimination by examining whether Plaintiffs' speech was "controversial" and how listeners might react to the speech.

R. Doc. 58, at 17, 19, 25–28.

[18]Whether the term "as-applied" is pertinent to the students' remaining First Amendment claims is unnecessary to decide. We assess standing based on allegations of injury fairly traceable to the defendants' *conduct*. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Because the students' remaining claims are based on conduct outside the LSEP, they are not challenging the University's application of the written LSEP policy. As such, the claims are not a "paradigmatic as-applied attack." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

-24-

the LSEP and the complaint should not be construed as if they had. To show standing, the students' complaint needs only include "general factual allegations of injury resulting from the defendant[s'] conduct." *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (quoting *Lujan*, 504 U.S. at 561). In my view the complaint easily satisfies this modest standard.

## II. Summary Judgment

Because I believe the students have standing, I turn to review of the district court's grant of summary judgment to the defendants. Granting summary judgment was improper because, viewed in the light most favorable to the students, the record evidence establishes a First Amendment violation.

When the students requested to reserve a venue on the main campus to host a speech by author and commentator Ben Shapiro, the request was handled in a most curious way. Notice of the request was transmitted to none other than the president of the University. The president's reaction was swift, and his directive to subordinates was clear and decisive: "So have they actually invited Ben Shapiro? I do not want this in the middle of campus—West Bank is a better location." This occurred four months before Shapiro was scheduled to speak. According to the record, all the president knew about Shapiro then was that he was "a right wing speaker and he made some appearances on other campuses."

Though the University previously hosted other controversial speakers on its main campus, it denied the students access to similar venues for the Shapiro event.

---

Regardless, such labels do not dictate pleading requirements. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("The distinction [between facial and as-applied claims] . . . goes to the breadth of the remedy . . . not what must be pleaded in a complaint."). And more importantly, "[t]he right to challenge a policy under the First Amendment is the same whether the policy is written or not." *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 616 (E.D. Pa. 2014).

In fact, the University eventually relegated the event to the St. Paul campus—far away from most student housing. Unknown to the students at the time, the head of campus security informed a facilities director two months before the event that "the admin has asked that we try to move [Shapiro's] visit to the St. Paul campus."

Despite these facts, the district court awarded the University officials summary judgment. In doing so, it repeatedly made inferences in favor of the officials to explain away the above-referenced evidence. For example, it inferred the reason the officials treated the students less favorably than groups with differing views was because of security concerns—despite evidence that other speakers who had similar security needs were invited to speak at the Minneapolis campus. Surely, viewing the evidence in a light most favorable to the plaintiffs does not entail taking the defendants' word for it that they had innocent and neutral intentions. Granting the defendants these types of inferences flips the summary judgment standard on its head. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (explaining that "under either prong [of the qualified immunity test], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"). Properly viewed under the summary judgment standard, I believe the record evidence demonstrates a reasonable jury could conclude the students' clearly established First Amendment rights were violated. I would thus reverse the order granting summary judgment.

_____